UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

JOSEPH RAYMOND GRECO, III                    CIVIL ACTION

VERSUS                                       NO: 13-3514

VELVET CACTUS, LLC AND SCOTT                 SECTION: R
DICKINSON

**ORDER AND REASONS**

Plaintiff Joseph Raymond Greco, III filed this suit against defendants The Velvet Cactus, LLC and Scott Dickinson asserting claims for sexual harassment and retaliation under Title VII of the Civil Rights Act of 1964.[1] He also asserts state law battery claims against both defendants. Defendants now move the Court for summary judgment against each of Greco's claims.[2] Greco's sexual harassment and retaliation claims against Dickinson fail because Dickinson was never Greco's employer. Greco's retaliation claim against The Velvet Cactus fails because he cannot establish a causal connection between an activity protected by Title VII and his termination. His sexual harassment claim against The Velvet Cactus fails because Greco does not demonstrate a genuine issue of fact as to whether Dickinson's conduct was unwelcome. In the absence of a surviving federal claim, the Court declines to exercise jurisdiction over Greco's state law claims and dismisses

---

[1] R. Doc. 1.

[2] R. Doc. 28; R. Doc. 29.

them without prejudice. Accordingly, the Court GRANTS defendants'
motions for summary judgment.

## I.    BACKGROUND

The Velvet Cactus is a Mexican-inspired restaurant located
in New Orleans, Louisiana and owned by Herb Dyer, Howard White,
and Scott Dickinson.[3] Dickinson also was employed as the General
Manager of The Velvet Cactus from May 2010 through February 2013,
at which time he was demoted to Assistant General Manager.[4]
Dickinson hired plaintiff Joseph Greco as a busboy in September
2011.[5] During the course of Greco's employment at The Velvet
Cactus, he and Dickinson often socialized after work hours at
Parlay's Bar, located across the street from The Velvet Cactus,
or at Hoshun Restaurant.[6] At some point during Greco's
employment, a coworker took a photograph of Greco playfully
attempting to lick Dickinson's nipple through Dickinson's shirt.[7]

Greco and Dickinson socialized during work hours as well. On
one occasion, Amanda Palamone, the coworker who took the

---

[3] Plaintiff's Statement of Material Facts, R. Doc. 44-1 at
1.

[4] *Id.* at 2.

[5] *Id.* at 2.

[6] Greco Deposition, R. Doc. 28-2 at 22-23.

[7] Photograph, R. Doc. 28-3; Amanda Palamone Affidavit, R.
Doc. 28-8 at 2.

aforementioned photograph, witnessed Greco as he was bending down to pick up trash from the floor. Palamone states that Greco turned to look at Dickinson, spanked his own rear end, and asked Dickinson, "Are you ready for the show?"[8] Christina Ingrassia, another Velvet Cactus server, stated that she witnessed Greco poking Dickinson in the rear with a broom stick during her shifts.[9] She also stated in her affidavit that "on multiple occasions," she witnessed Greco calling Dickinson a "fag" and initiating other sexual jokes.[10] Despite witnessing Greco and Dickinson together on many occasions, neither Ingrassia nor Palamone ever witnessed Greco asking Dickinson to stop talking to him or to refrain from making jokes.[11]

Greco and Dickinson also exchanged a number of text messages over the course of Greco's employment. Examples of Greco's messages to Dickinson include:

July 17, 2012: "No doubt thank you baby."[12]
September 4, 2012: "U left yet?"[13]

---

[8] R. Doc. 28-8 at 1.

[9] Christina Ingrassia Affidavit, R. Doc. 28-7 at 1.

[10] *Id.* at 1.

[11] *Id.* at 1; R. Doc. 28-8 at 1.

[12] Dickinson Declaration, R. Doc. 38-2 at 17. *See also* Exhibit 4, which contains a record of these text messages. Greco stated in his deposition that he did not know whether he authored this text message. R. Doc. 28-2 at 63-64.

[13] R. Doc. 38-2 at 17.

3

September 4, 2012 (In response to Dickinson's "Not going buddy"): "Alrite bud. Next time."[14]
October 18, 2012: "Outside parleys. U comin?"[15]
November 22, 2012: "Piddling the poodler...what u doing snake wrangler"[16]
November 22, 2012: "U at parleys? ill be ur bf if u can get in."[17]
January 12, 2013: Text message containing a photograph of Greco and reading "Thinking of u ☺"[18]
January 19, 2013: "Meet us there. We left."[19]

The sexual banter between Greco and Dickinson was not a one way street, however. Dickinson once sent Greco a text message asking, "Am I a companion that can come over for drinks?" Greco responded, "Depends on your drink of choice..." to which Dickinson replied, "Joe juice, lol [laugh out loud]."[20] On another occasion, Dickinson sent Greco a message reading "Hey buddy. How's your day going? Remember, we are dating now."[21] Dickinson stated in his deposition that he thought the message

---

[14] *Id.*

[15] R. Doc. 38-2 at 18; R. Doc. 28-2 at 26.

[16] R. Doc. 38-2 at 18. Greco stated at his deposition that "snake wrangler" was a nickname he came up with for Dickinson. R. Doc. 28-2 at 28-29.

[17] R. Doc. 38-2 at 18; R. Doc. 28-2 at 29-30.

[18] R. Doc. 38-2 at 19.

[19] *Id.* Greco was "not sure" if he sent this message. R. Doc. 28-2 at 31.

[20] Dickinson Deposition, R. Doc. 44-2 at 59.

[21] *Id.* at 52-53.

was funny because an unidentified employee had spread a rumor about Dickinson and Greco being in a relationship.[22] On a third occasion, Dickinson sent Greco a message that read, "About to dream about you. LOL."[23] Dickinson also admits to once calling Greco a "douche."[24]

Dickinson admitted that he "often" touched Greco's penis, but he insisted that he would do so "in retaliation" after Greco did the same to Dickinson.[25] Dickinson stated that this would occur "[o]ften . . . . Every time he hit me, I would hit back."[26] Dickinson further admits that he once tried to kiss Greco on the cheek outside of work "as a joke."[27] He stated that Greco never objected when Dickinson touched Greco's penis or tried to kiss Greco, but he admitted that Greco turned his head "away and then back toward [Dickinson]" when Dickinson attempted the kiss.[28]

**The Velvet Cactus's Sexual Harassment Policy**

---

[22] *Id.* at 53.

[23] *Id.* at 55.

[24] *Id.* at 56.

[25] *Id.* at 49.

[26] *Id.*

[27] *Id.* at 49–50.

[28] *Id.* at 50.

The Velvet Cactus has an employee handbook containing its sexual harassment policy.[29] The handbook defines sexual harassment and urges employees to promptly report any conduct constituting harassment "to at least two people who are in a supervisory or management capacity."[30] The handbook also guarantees employees that their complaints will remain confidential to the extent possible.[31] The date that appears at the bottom of each page of the handbook is May 29, 2013.[32] In his motion to strike,[33] which the Court addressed in a separate order, Greco asserts that the date listed proves that the handbook was created after Greco was terminated in March 2013. Dyer stated in his deposition that the listed date reflects the date on which the document was last opened.[34] Dyer further stated that the handbook was developed in 2011.[35] Regardless of when the

---

[29] R. Doc. 28-10 at 14-15.

[30] *Id.*

[31] *Id.*

[32] *Id.*

[33] R. Doc. 40.

[34] R. Doc. 45-2 at 4.

[35] R. Doc. 44-3 at 31.

handbook was created, Greco denies ever receiving a copy of it,[36] and Dyer was unsure whether one was given to Greco.[37]

Defendants submitted a photograph showing a copy of The Velvet Cactus's sexual harassment policy posted to the office door in the back of the restaurant.[38] The policy shown in the photograph states in large, bold letters that "<u>Sexual Harassment</u> is NOT TOLERATED." It defines sexual harassment and encourages employees to report any harassment to a manager. It further states, "If your complaint is against your manager or if you feel uncomfortable reporting the matter to them, please contact Herbert Dyer" at the listed phone number.[39] The policy guarantees confidentiality to the extent possible and indicates that employees who make good-faith complaints will not be subject to retaliation.[40] Dyer stated in his affidavit that the policy had been posted to the office door since the restaurant first opened.[41]

---

[36] R. Doc. 28-2 at 9.

[37] R. Doc. 44-3 at 24.

[38] R. Doc. 28-12; Herbert Dyer Affidavit, R. Doc. 28-16 at 2.

[39] R. Doc. 28-12 at 2-3.

[40] *Id.*

[41] R. Doc. 28-16 at 2.

Greco denies that the policy was posted on the office door during his employment.[42] He admits to seeing another document explaining The Velvet Cactus's sexual harassment policy on a bulletin board adjacent to the time clock where he punched in and out of work each day, but he claims that he never read it.[43]

The Velvet Cactus also had its employees sign a condensed list of rules each year.[44] The rule sheet Greco signed in November of 2011 did not refer to the restaurant's sexual harassment policy, but a second rule sheet, signed by Greco on December 18, 2012, stated that "[s]exual harassment will not be tolerated by anyone" and instructed any employee experiencing harassment to "please see a Manager and we will handle accordingly."[45] Greco stated in his deposition that as a result of signing the second rule sheet, he understood that he was supposed to see a manager if he was being sexually harassed.[46]

**Investigation of Dickinson's Conduct**

In January 2013, Dyer received an email from an employee complaining of Dickinson's behavior towards certain identified

---

[42] R. Doc. 28-2 at 5-6.

[43] *Id.* at 6-7.

[44] Aimee Sandrock Affidavit, R. Doc. 28-11 at 1; R. Doc. 28-12.

[45] R. Doc. 28-12.

[46] R. Doc. 28-2 at 8.

employees.[47] This prompted Dyer to post a message to The Velvet Cactus Employee Facebook page that read:

> Having a productive work environment is our top priority. We do not want anyone to ever feel threatened. If anyone feels they have been a victim of sexual Harassment please contact me immediately: This will be kept strictly confidential.[48]

Dyer provided his phone number and personal email address at the bottom of the message. In response, Dyer claims to have received two additional letters complaining of Dickinson's inappropriate behavior as General Manager, one of which was from employee Freddie Martinez.[49] At some point before Greco was terminated,

---

[47] R. Doc. 28-16 at 1.

[48] R. Doc. 28-17; R. Doc. 28-16 at 1. The Court considers this evidence because it is not being introduced for the truth of the matter asserted; rather, the purpose is to indicate when Greco would have been on notice of this opportunity to report Dickinson's allegedly harassing behavior.

[49] , R. Doc. 28-16 at 1; R. Doc. 38-2 at 24-30; R. Doc. 44-3 at 46. Dyer states in his affidavit that the original complaint came from Martinez. In his deposition, he indicated that the original complaint was anonymous but that he believed Martinez was the author based on its similarities to Martinez's response to the Facebook post and because both messages came from the same email address. Neither party provides details regarding the other message that supposedly was submitted in response to Dyer's Facebook post. Martinez indicates in his affidavit that he sent a letter to Dyer regarding Dickinson in January 2013, but it is unclear whether he is referring to the initial, anonymous letter or his response to Dyer's Facebook post. R. Doc. 28-15 at 1.

Plaintiff objected to defendants' Statement of Material Facts #13, which indicated that Dyer received only two written complaints. R. Doc. 44-1 at 4. He first argues that the statement relies on inadmissible evidence (the two letters), despite the fact that defendants use the evidence for a permissible purpose-to explain Dyer's process for handling the complaints-while plaintiff impermissibly relies on the very same evidence to prove the truth of the matters asserted therein. *Cf.*

Martinez told Greco about his email to Dyer.[50] Unlike Martinez, Greco did not respond to Dyer's request for comment.

Dyer and White met with Dickinson to discuss the allegations.[51] Dyer suspended Dickinson without pay for either two or three weeks.[52] He also met with the managers, who work in a supervisory position below the GM and Assistant GM.[53] During his suspension, Dickinson would visit the restaurant to prepare the cash drawers and make bank deposits, but he would leave before the restaurant opened.[54] Dyer and co-owner Rusty White

---

*Brauninger v. Motes*, 260 F. App'x 634, 637 (5th Cir. 2007) (noting that evidence of employee statements relating to sexual harassment investigation were not hearsay because they were offered to show what information the employer relied on in making its decision, and *not* for the truth of the allegations they contained).

Greco also contests the assertion that Dyer received only two letters based on the fact that Dyer *later* received additional comments regarding Dickinson's behavior in response to a separate request, discussed below. That objection is without merit. Greco relies on these additional employee comments for the truth of the matters asserted as well, but the Court does not consider this hearsay evidence on a motion for summary judgment.

Finally, Greco points to portions of Dyer's transcript as evidence of the falsity of the statement, but he did not provide the relevant pages.

[50] R. Doc. 28-2 at 36.

[51] R. Doc. 44-2 at 14-15.

[52] R. Doc. 28-16 at 1; Dyer Deposition, R. Doc. 38-2 at 25-27 (three weeks); R. Doc. 44-2 at 15-16 (suggesting suspension was two weeks).

[53] R. Doc. 38-2 at 30; R. Doc. 44-2 at 20.

[54] R. Doc. 44-2 at 16.

then conducted a confidential written survey of each employee asking whether he or she agreed or disagreed to the reinstatement of Dickinson as General Manager.[55] Of the 43 employees, five, including Martinez, responded that they did not agree to Dickinson's reinstatement as GM.[56] Greco signed the letter agreeing to Dickinson's reinstatement without comment.[57]  White spoke to two of the employees in person,[58] while Dyer spoke to Martinez.[59]

Upon Dyer's belief that each employee felt comfortable with Dickinson's return to the restaurant, Dyer and White spoke to Dickinson to discuss their expectations upon his return.[60] Dickinson was demoted to Assistant GM, while Aimee Sandrock, the former Assistant GM, was promoted to GM.[61] Dickinson's demotion entailed a pay decrease of approximately $18,000,[62] and though he

---

[55] R. Doc. 28-16 at 1; R. Doc. 28-18 at 1.

[56] R. Doc. 28-18 at 1: R. Doc. 19; R. Doc. 20.

[57] R. Doc. 28-20.

[58] R. Doc. 28-18 at 1.

[59] R. Doc. 28-16 at 1.

[60] *Id.* at 2.

[61] R. Doc. 44-3 at 12-13. Greco argues in his opposition brief that The Velvet Cactus did not have an Assistant GM before Dickinson's demotion, but Greco stated multiple times in his deposition that Aimee was the Assistant GM when he began working there.

[62] R. Doc. 44-1 at 8;

11

retained managerial authority, Sandrock assumed final authority for all managerial decisions.[63]

Upon Dickinson's return, Dyer hosted an in-person meeting with The Velvet Cactus staff. Dickinson issued a public apology at the meeting, and Dyer instructed the staff to report any mistreatment or sexual harassment to him or to Sandrock.[64] After Dickinson's return, no one, Greco and Martinez included, reported any further inappropriate conduct by Dickinson.[65]

**Greco's Termination**

Greco stated under penalty of perjury in his EEOC charge that before his termination, he had never been disciplined or written up for any reason.[66] In fact, his employment was riddled with disciplinary problems.[67] On December 5, 2011, Sandrock completed an Employee Corrective Action Notice indicating that Greco had received his "final written warning" for failing to appear for his shift.[68] On February 27, 2012, Greco received another "final written warning" from Sandrock, which read:

---

[63] R. Doc. 44-2 at 23-25.

[64] R. Doc. 28-16 at 2; R. Doc. 44-1 at 7.

[65] R. Doc. 28-2 at 41-42; R. Doc. 28-15 at 1.

[66] R. Doc. 28-2 at 13.

[67] Greco stated that he was told his former disciplinary writeups "were taken away." R. Doc. 28-2 at 13.

[68] Employee Corrective Action Notice, R. Doc. 28-9 at 1.

> Consistently late after numerous verbal warnings. Next step
> employee will be terminated.[69]

Greco signed this disciplinary notice and admits to discussing

his tardiness with Sandrock.[70]

On August 24, 2012, Greco received a third written warning

from Sandrock for consuming food that he had been instructed to

throw away.[71] The lists of rules that Greco signed in both 2011

and 2012 stated:

> No eating while clocked in—this includes chips. Also, if you
> are ever caught eating something that is not paid for you
> will automatically be terminated. This is considered
> stealing. This also includes eating while rolling
> silverware.[72]

Under the "Incident Description" heading, Sandrock wrote:

> Next corrective action will be employee will be suspended
> [sic] after that employee will be terminated.[73]

Later, in a space reserved for the supervisor's "personal

improvement plan input and suggestions," Sandrock added:

> Spoke to employee about this action. Next time eating will
> be terminated if I feel.[74]

---

[69] *Id.* at 4.

[70] R. Doc. 28-2 at 15-16.

[71] R. Doc. 28-9 at 7.

[72] R. Doc. 28-12.

[73] R. Doc. 28-9 at 7.

[74] *Id.* at 8.

Greco admitted to signing this notice, but he denies that Sandrock ever told him he would be terminated for his next violation.[75] Greco further admits to drinking alcohol at work while under the age of 21, which he acknowledged was a violation of the restaurant's rules.[76] Greco sent Dickinson a text message concerning this incident after it apparently became known to management, taking full responsibility for his actions and stating that "[i]f anyone is going to get into trouble, it should be me."[77]

On March 17, 2013, Sandrock terminated Greco after catching him eating unpurchased food for the second time.[78] In the comments of termination notice, Sandrock wrote:

Employee was caught eating in back food which was considered stealing after being written up once before[79]

Greco admits that he was eating unpurchased food at the time.[80]

**Allegations of Sexual Harassment**

---

[75] R. Doc. 28-2 at 18.

[76] *Id.* at 26-28.

[77] *Id.* at 26-27.

[78] *Id.* at 19; Termination Notice, R. Doc. 28-22; Sandrock Affidavit, R. Doc. 28-11 at 1-2.

[79] R. Doc. 28-22.

[80] R. Doc. 28-2 at 20.

14

Approximately one month after his termination, Greco filed a police report against Dickinson, alleging that Dickinson committed battery against him between the dates of May 5, 2012 and February 2013.[81] Greco then mailed a handwritten letter to Dyer alleging that he had been sexually harassed by Dickinson while employed at The Velvet Cactus and complaining that he had been unjustly terminated.[82] Two days later, Greco filed his formal complaint with the Equal Employment Opportunity Commission ("EEOC"), alleging sexual harassment and discrimination.[83] On May 21, 2013, plaintiff filed his verified complaint in this action,

---

[81] R. Doc. 44-11. Again, defendant impermissibly relies on the report as evidence of the truth of the statements he made to the police. *See United States v. Paladin*, No. 12-2098, — F.3d —, 2014 WL 1876989 (1st Cir. May 12, 2014)("Statements in police reports made by individuals other than the reporting officer ... constitute hearsay upon knowledge, and are therefore inadmissible.")(quoting *United States v. Walthour*, 202 F. App'x 367, 370 (11th Cir. 2006)); *accord Martin v. Strain,* CIV.A. 08-1197, 2009 WL 1565869, at *1 (E.D. La., June 2, 2009).

[82] R. Doc. 28-23. Defendant also impermissibly relies on this letter for the truth of the allegations it contains.

[83] R. Doc. 28-24. The EEOC charge constitutes yet another piece of hearsay evidence to the extent Greco relies on it for the truth of its contents. *See Stolarczyk ex rel. Estate of Stolarczyk v. Senator Int'l Freight Forwarding, LLC*, 376 F. Supp. 2d 834, 841-42 (N.D. Ill. 2005) (stating that EEOC charges are presumptively inadmissible and "lack sufficient guarantees of trustworthiness to be excepted from the hearsay rule.") (quoting *Moffett v. McCauley*, 724 F.2d 581, 584 n. 1 (7th Cir. 1984)); *accord Johnson v. AutoZone, Inc.*, 768 F. Supp. 2d 1124, 1134 (N.D. Ala. 2011) (indicating that EEOC charges are inadmissible for a number of reasons, "including on the basis of relevance, a Rule 403 balancing test, and hearsay.") (quoting *Frazier v. Ind. Dep't of Labor*, No. IP01-0198-C-T/G, 2003 WL 21254424, at *4 (S.D. Ind. Mar. 17, 2003)).

alleging sexual harassment and retaliation under Title VII, as well as battery under Louisiana law.[84] Greco alleges that his termination was pretextual and that the real reason he was fired was because "he did not submit, and in fact protested and resisted, the homosexual advances of Scott Dickinson.[85] He also made the following assertions:

> [Greco] became aware of a pervasive and hostile pattern of sexual harassment that permeated The Velvet Cactus. It centered on the General Manager Scott Dickinson (Dickinson), who regularly used profanity and frequently made obscene sexual gestures. Dickinson made frequent homosexual advances upon Greco and sometimes physically stroked and touched him and otherwise committed battery upon him. Greco at all times objected to all these advances and at all times informed Dickinson of his objection, to no avail. Additionally, Dickinson periodically escorted underage employees across the street and bought them alcoholic beverages. This open and notorious activity was all fairly routine and continued on a day to day basis.[86]

Greco stated in his deposition that he "would try to push [Dickinson] off of [him], try not to let him do the sexual harassment, or tell him to stop."[87] It is not clear from the portion of the deposition transcript to what incident or incidents Greco is referring. He admits, however, that during his 18 months of employment at The Velvet Cactus, he never reported Dickinson's behavior to anyone, including Sandrock, Dyer, or

---

[84] R. Doc. 1.

[85] *Id.* at 1.

[86] *Id.*

[87] R. Doc. 28-2 at 21.

16

White, although he dealt with Sandrock regularly and knew who both Dyer and White were, having seen them before at the restaurant.[88]

## II.   LEGAL STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). When assessing whether a dispute as to any material fact exists, the Court considers "all of the evidence in the record but refrain[s] from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398–99 (5th Cir. 2008). All reasonable inferences are drawn in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment." *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985); *see also Little*, 37 F.3d at 1075.

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come

---

[88] R. Doc. 28-2 at 9-10.

forward with evidence which would 'entitle it to a directed verdict if the evidence went uncontroverted at trial.'" *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264–65 (5th Cir. 1991). The nonmoving party can then defeat the motion by either countering with evidence sufficient to demonstrate the existence of a genuine dispute of material fact, or "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." *Id.* at 1265.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See id.* at 324. The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue for trial. *See, e.g., id.; Little*, 37 F.3d at 1075 ("Rule 56 'mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" (quoting *Celotex*, 477 U.S. at 322)).

18

"Because the objective of summary judgment is to prevent
unnecessary trials, and because [v]erdicts cannot rest on
inadmissible evidence, it follows that the evidence considered at
summary judgment must be capable of being converted into
admissible evidence." *Akers v. Liberty Mut. Grp.*, 744 F. Supp. 2d
92, 95-96 (D.D.C. 2010) (internal quotation marks omitted)
(quoting *Greer v. Paulson*, 505 F.3d 1306, 1369 (D.C. Cir. 2007));
*see also Cormier v. Pennzoil Exploration & Prod. Co.*, 969 F.2d
1559, 1561 (5th Cir. 1992) (refusing to consider at the summary
judgment stage a plaintiff's affidavits because they were not
based on personal knowledge and relied on hearsay statements).
"[S]heer hearsay ... counts for nothing on summary judgment."
Greer, 505 F.3d at 1315 (internal quotation marks omitted)
(quoting *Gleklen v. Democratic Cong. Campaign Comm., Inc.*, 199
F.3d 1365, 1369 (D.C. Cir. 2000)).

## III. DISCUSSION

### A.   Title VII Claims Against Dickinson

A claim under Title VII is enforceable only against an
employer, not an employee. *See Franklin v. City of Slidell*, 928
F. Supp. 2d 874, 881 (E.D. La. 2013) ("The Fifth Circuit has also
repeatedly held, in spite of the agent provision in Title VII,
that individuals, in particular employees and supervisors, cannot
be held liable under Title VII in either their individual or
official capacities.") (citing *Ackel v. Nat'l Commc'ns, Inc.*, 339

F.3d 376, 382 n. 1 (5th Cir. 2003), and *Smith v. Amedisys Inc.*, 298 F.3d 434, 448 (5th Cir. 2002)).

Greco does not appear to dispute this fact. Accordingly, the Court dismisses Greco's Title VII claims against Dickinson with prejudice.

**B.   Title VII Claims Against The Velvet Cactus**

*1. Sexual Harassment*

To establish a claim for sexual harassment under Title VII, a plaintiff must demonstrate that: (1) He is a member of a protected group; (2) He was the victim of unwelcome sexual harassment; (3) The harassment was based on sex; (4) The harassment affected a term, condition, or privilege of his employment; and (5) His employer knew or should have known of the harassment and failed to take prompt remedial action. *Harvill v. Westward Communications, LLC*, 433 F.3d 428, 434 (5th Cir. 2005). Following the Supreme Court's decision in *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998), and *Burlington Ind. v. Ellerth*, 524 U.S. 742 (1998), a plaintiff must prove only the first four elements when the alleged harasser is the plaintiff's supervisor. *See Watts v. Kroger*, 170 F.3d 505, 509 (5th Cir. 1999). If a plaintiff can prove the first four elements, an "employer is subject to vicarious liability to a victimized employee." *Id.* (quoting Faragher, 524 U.S. at 807).

Defendants argue that Greco fails to satisfy the second prong of the test because the uncontroverted evidence indicates

that Dickinson's conduct was not unwelcome. They point to Greco's
numerous text messages to Dickinson, in which Greco indicated
that he was "piddling the poodler," referred to Dickinson as
"baby" and "snake wrangler," and offered to be Dickinson's "bf"
if he could get into Parlay's. They further point to Ingrassia's
affidavit indicating that during her shifts at the restaurant,
she witnessed Greco poking Dickinson in the rear with a
broomstick. She also stated that she witnessed Greco "calling
Dickinson "fag" and initiating other sexual jokes" on "multiple
occasions." Separately, Palamone witnessed Greco bend down, spank
his own behind, and ask Dickinson if he was ready for the show.
On yet another occasion, Greco was photographed attempting to
lick Dickinson's clothed nipple. Greco admits that he never asked
Dickinson to stop texting him. In addition, his statement under
penalty of perjury that he "at all times objected to all [of
Dickinson's] advances and at all times informed Dickinson of his
objection," is inconsistent with the position he takes in his
brief: specifically, that Dickinson liked him and "protected" him
at work "as long as [Greco] acquiesced to the offensive
behavior."[89] Greco goes on to argue that he was terminated "as
soon as [he] rejected Mr. Dickinson's sexual advances,"
suggesting that he did not actually do so until some time shortly
before his departure.

---

[89] R. Doc. 44 at 2.

The Fifth Circuit defines "unwelcome sexual harassment" as "sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature that is unwelcome in the sense that it is unsolicited or unincited and is undesirable or offensive to the employee." *Marquez v. Voicestream Wireless Corp.*, 115 F. App'x 699, 701 (5th Cir. 2004) (quoting *Wyerick v. Bayou Steel Corp.,* 887 F.2d 1271, 1274 (5th Cir. 1989)). The correct inquiry is whether Greco indicated by his conduct that the alleged sexual advances were unwelcome. *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 58 (1986).

If an employee engaged in the same type of workplace conduct of which he complains in court, he must "be able to identify with some precision a point at which [he] made known to [his] co-workers or superiors that such conduct would hencefore [sic] be considered offensive." *Loftin-Boggs v. City of Meridian, Miss.* 633 F. Supp. 1323, 1326-27 & n.8 (S.D. Miss. 1986), *aff'd sub nom. Loftin-Boggs v. Meridian*, 824 F.2d 971 (5th Cir. 1987). After making his objections known to the coworker in question, the employee's conduct must continue to signal with consistency that the alleged harassment is unwelcome. If an employee asks a coworker or supervisor to stop the allegedly harassing conduct but continues to "engag[e] in behavior similar to that which [he] claimed was unwelcome and offensive," his conduct "fails to send a consistent signal" that the defendant's actions are unwelcome. *See Ryan v. Capital Contractors, Inc.*, 679 F.3d 772 (8th Cir.

2012) (observing that the defendant's conduct was not clearly unwelcome, notwithstanding the plaintiff's assertion that he repeatedly asked the defendant to stop, when both parties participated in name-calling and physical horseplay with one another); *Scusa v. Nestle U.S.A. Co., Inc.,* 181 F.3d 958, 966 (8th Cir. 1999) (upholding a grant of summary judgment where the plaintiff yelled and swore at her co-workers in the same manner that she claimed constituted harassment). In *Loftin-Boggs*, the plaintiff had submitted a grievance regarding her coworker's alleged harassment, but the Court ruled against her because "the evidence did not show that her conduct or her reaction to others' conduct changed subsequently."[90] *Id. See also Dufrene v. Pellittieri*, CIV. A. 95-3806, 1996 WL 502459, at *4 (E.D. La. Sept. 4, 1996); *Badii v. Rick's Cabaret Int'l, Inc.*, 3:12-CV-4541-B, 2014 WL 550593, at *24 (N.D. Tex. Feb. 11, 2014) (applying the same standard). Similarly, a district court judge in New York granted summary judgment for a Title VII defendant because the totality of the plaintiff's conduct, including a persistent stream of flirtatious emails, belied her assertions

---

[90] *Loftin-Boggs* was decided after a trial rather than on a motion for summary judgment, which allowed the judge to make credibility assessments in reaching his conclusion. Nonetheless, his reasoning is equally persuasive in the context of a motion for summary judgment. The question simply becomes whether there is a genuine factual dispute as to whether Greco has identified a specific point in time at which he indicated that Dickinson's conduct was no longer welcome and whether Greco's behavior going forward was consistent with that message.

that her coworker's conduct was unwelcome, despite the fact that she claimed to have objected to his advances. *See Zhao v. Kaleida Health*, No. 04-CV-467-JTC(JJM), 2008 WL 346205, at *4-7 (W.D.N.Y. Feb. 7, 2008) (quoting *Loftin-Boggs*).

The Court accepts as true Greco's unsubstantiated allegation that he objected to Dickinson's advances. Nevertheless, summary judgment is appropriate because the uncontroverted evidence demonstrates that Greco's behavior "failed to send a consistent signal that [Dickinson's] conduct was unwelcome." *Ryan*, 679 F.3d at 779. As discussed above, "unwelcome," harassment must be both (1) unsolicited or unincited *and* (2) undesirable or offensive to the employee. *Wyerick*, 887 F.2d at 1274. Even accepting Greco's assertions that Dickinson's conduct was undesirable or offensive to him, the totality of Greco's conduct failed to signal that fact. Rather, the uncontroverted evidence paints a picture of a good-natured relationship characterized by frequent, joking sexual banter and touching. Nor can it be said that Dickinson's advances were unsolicited or unincited. Nowhere in the record does Greco dispute Dickinson's assertion that he would touch Greco's genitals "in retaliation" for Greco doing the same. Greco does not deny the allegations relating to his own participation in the sexual banter; nor does he attempt to explain why his conduct would not signal his acceptance of Dickinson's advances.

Turning to the standard discussed in *Loftin-Boggs*, Greco does not identify a particular point at which he clearly

24

indicated that, going forward, Dickinson's conduct would be considered offensive. *Id.* at 1327 n. 8. Although Greco's self-serving statements in the verified complaint indicate that he objected constantly, he also claims that he acquiesced to Dickinson's advances until shortly before his termination. *Cf. Zhao*, 2208 WL 346205, at *6 (plaintiff's claim that she submitted to her coworker's advances out of fear contradicted her claim that she "repeatedly rejected" his advances). Moreover, the remainder of the uncontroverted evidence shows that Greco's behavior towards Dickinson was inconsistent with his alleged objections throughout the duration of his employment.

The Fifth Circuit's decision in *Wyerick* is distinguishable and does not undermine the Court's conclusion that summary judgment is appropriate. In *Wyerick*,[91] the plaintiff had been subjected to "an onslaught of sexual remarks and gestures" from numerous male coworkers and supervisors at her job as a steel plant crane operator after she had been forced to remove her shirt in public during a medical emergency. 887 F.2d at 1272. The sexual comments often made specific reference to the incident, occurred up to two or three times per day, and continued even after Wyerick filed suit, despite the fact that she reported the harassment to management on four separate occasions. *Id.* The Fifth Circuit concluded that summary judgment was not warranted

---

[91] *Wyerick* involved a sexual harassment claim brought under Louisiana law, but the considerations are identical.

simply because the plaintiff had made, "at most, three sexual comments," which were "limited replies" to her coworkers' insults over a two-year period. *Id.* at 1272-73 & n.4, 1275.

Whether a defendant's conduct is welcome indeed may in some cases be an "intensely factual inquiry" that "turns largely on credibility determinations," *Wyerick*, 887 F.2d at 1275, but that does not preclude summary judgment when, accepting as true the plaintiff's sworn assertions, the uncontroverted evidence still demonstrates that the plaintiff solicited or incited the alleged harassment.[92]

Accordingly, the Court concludes that Greco has failed to demonstrate a genuine issue of fact as to whether Dickinson's conduct was unwelcome. The Court grants defendants' motion for summary judgment against Greco's sexual harassment claim.

---

[92] This case is likewise distinguishable from cases holding that a plaintiff's use of foul language or sexual innuendo in an unrelated, consensual setting conclusively demonstrates that he or she is "the kind of person" who would welcome the same type of behavior from a coworker in the workplace. *See Swentek v. USAIR, Inc.*, 830 F.2d 552, 557 (4th Cir. 1987); *Burns v. McGregor Elec. Indus., Inc.*, 989 F.2d 959, 963 (8th Cir. 1993). It is equally distinguishable from cases in which a plaintiff participates in good-natured, albeit crude, joking among coworkers but then is subjected to "intensely personal and demeaning remarks" from a particular employee. *See E.E.O.C. v. Fairbrook Med. Clinic, P.A.*, 609 F.3d 320, 329 (4th Cir. 2010).

ii. *Retaliation*

Greco also asserts a Title VII claim for retaliation based on his termination from The Velvet Cactus. To establish a prima facie case of retaliation, the plaintiff must establish that: (1) he participated in an activity protected by Title VII; (2) his employer took an adverse employment action against him; and (3) a causal connection exists between the protected activity and the adverse employment action. *McCoy v. City of Shreveport*, 492 F.3d 551, 556-57 (5th Cir. 2007). Once the plaintiff makes a prima facie case, "the burden then shifts to the defendant to demonstrate a legitimate nondiscriminatory purpose for the employment action." *Pineda v. United Parcel Serv., Inc.*, 360 F.3d 483, 487 (5th Cir. 2004). If the defendant meets this burden, then the "the plaintiff must prove that the employer's stated reason for the adverse action was merely a pretext for the real, discriminatory purpose." *Id.*

Greco admits that he never reported the alleged harassment to a manager or supervisor. The "protected activities" to which Greco refers are his alleged complaints directly to Dickinson, as well as his complaint to Dyer one month *after* his termination. Defendants argue that Greco has failed to present evidence that he engaged in a protected activity or that there was a causal connection between that activity and his termination.

27

Even assuming that Greco's complaints qualify as "protected activities," he has failed to establish a nexus between the complaints and his termination. First, it would have been impossible for Sandrock to terminate Greco based on his complaint to Dyer, as it had not yet occurred. Second, Greco has presented no evidence that Sandrock knew of Greco's alleged complaints to Dickinson before she fired him. Greco never informed Sandrock of the harassment, and other than pointing out that Dickinson and Sandrock were roommates at the time, he provides no evidence suggesting that Dickinson instructed or encouraged Sandrock to terminate Greco. Moreover, Sandrock stated in her affidavit that (1) Dickinson did not have any influence over her decision to terminate Greco; (2) Greco never reported any harassment to her during his employment; and (3) at the time of Greco's termination, she was unaware that Greco felt he had been sexually harassed by Dickinson.[93] Rather, the evidence, including her own sworn statements, indicates that she terminated Greco for violating the restaurant's rule against eating unpurchased food, consistent with her previous written warning. Moreover, Greco's termination occurred roughly one and a half months after Dickinson's initial suspension.

Greco argues that the stated reason for his termination was pretextual, because, as Dickinson admitted in his deposition, he

---

[93] R. Doc. 28-11 at 2.

frequently observed employees consuming food on their shifts but rarely disciplined them.[94] Overlooking that Dickinson's disciplinary practices say nothing about Sandrock's views on the subject, the fact remains that Greco had a lengthy disciplinary history  including multiple "final warnings" throughout the course of his employment. Moreover, Greco may argue that his termination was pretextual only if he *first* establishes a prima facie case of retaliation. Until he does so, The Velvet Cactus is not obligated to explain its reasons for his termination. Because Greco has failed to present any facts indicating the existence of a nexus between his alleged rejection of Dickinson's advances and Sandrock's decision to terminate him, he has not demonstrated a genuine issue of fact as to his prima facie case. Accordingly, the Court grants summary judgment dismissing this claim.

## C.  Plaintiff's State Law Claims

Greco asserted a state law claim for battery against Dickinson in the verified complaint.[95] He now argues that he also asserted state law sexual harassment claims, as well as a claim for assault, but these claims do not appear on the face of the complaint. The Court declines to exercise jurisdiction over the battery claim and any other state-law claims that may exist. *See*

---

[94] R. Doc. 44-2 at 61-62, 69-71.

[95]

*Chavers v. Hall*, 488 Fed. App'x 874, 878 (5th Cir. 2012) ("When all federal claims are dismissed or otherwise eliminated from a case prior to trial, we have stated that our general rule is to decline to exercise jurisdiction over the pendent state law claims.") (internal citations and quotation marks omitted); *Parker & Parsley Petroleum Co. v. Dresser Indus.*, 972 F.2d 580, 585 (5th Cir. 1992) ("Our general rule is to dismiss state claims when the federal claims to which they are pendent are dismissed.").

## IV.  CONCLUSION

For the foregoing reasons, the Court GRANTS defendants' motions for summary judgment, dismissing all federal claims with prejudice and all state-law claims without prejudice.

New Orleans, Louisiana, this __27th__ day of June, 2014.

SARAH S. VANCE

UNITED STATES DISTRICT JUDGE